1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

9
10  SALVADOR SANDOVAL,                        Case No. EDCV 13-1313-MWF (LAL)
11                          Petitioner,       **FINAL REPORT AND**
12                   v.                       **RECOMMENDATION OF UNITED**
                                              **STATES MAGISTRATE JUDGE**
13  MARTIN BITER,
14                          Respondent.
15
16
17        This Final Report and Recommendation is submitted to the Honorable Michael W.
18  Fitzgerald, United States District Judge, under the provisions of 28 U.S.C. § 636 and General
19  Order 194 of the United States District Court for the Central District of California.
20                                      **I.**
21                               <u>**PROCEEDINGS**</u>
22        On July 29, 2013, Salvador Sandoval ("Petitioner") filed a Petition for Writ of Habeas
23  Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254 ("Petition").  On February 19,
24  2014, Respondent filed an Answer to the Petition.  On March 17, 2014, Petitioner filed a Reply
25  to the Answer.  On March 2, 2015, at the Court's direction, Respondent filed an Amended
26  Answer.  On May 16, 2015, Petitioner filed an Amended Reply.  Thus, this matter is ready for
27  decision.
28

## II.

## PROCEDURAL HISTORY

On April 15, 2010, Petitioner was convicted after a jury trial in the San Bernardino County Superior Court of one count of first degree murder[1] and one count of street terrorism.[2] The jury further found true allegations that Petitioner personally and intentionally discharged a firearm which proximately caused the death of the victim[3] and that he committed the murder for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members.[4] (Volume 2 Clerk's Transcript ("CT") at 458-61, 532-35; Volume 5 Reporter's Transcript ("RT") at 1080-84.)  On July 9, 2010, Petitioner was sentenced to a total state prison term of 53 years to life. (2 CT at 529-30, 532-35; RT at 1097-98.)[5]

Petitioner appealed his convictions to the California Court of Appeal.  (Lodgments 3-4.) On April 20, 2012, the California Court of Appeal affirmed the judgment.  (Lodgments 5-6.)

Petitioner filed a petition for review in the California Supreme Court.  (Lodgment 7.)  On July 18, 2012, the supreme court granted the petition and remanded the action to the California Court of Appeal "to vacate its decision and reconsider the cause in light of *People v. Mesa* (2012) 54 Cal.4th 191."  (Lodgment 8.)

On September 27, 2012, the California Court of Appeal issued a second opinion ordering that Petitioner's sentence for street terrorism be stayed, but otherwise affirming the judgment. (Lodgment 9.)

Petitioner then filed a petition for review of the Court of Appeal's second opinion. (Lodgment 10.)  On January 3, 2013, the California Supreme Court denied review.  (Lodgment 11.)

---

[1] Cal. Penal Code § 187(a).
[2] Cal. Penal Code § 186.22(a).
[3] Cal. Penal Code § 12022.53(d).
[4] Cal. Penal Code § 186.22(b)(1).
[5] On appeal, the California Court of Appeal stayed Petitioner's three-year prison sentence for street terrorism and ordered the trial court to amend the abstract of judgment.  (Lodgment 9 at 21-23, 24.)  This Court has not been provided with an amended abstract of judgment.

1        On July 25, 2013, Petitioner filed a petition for writ of habeas corpus in the California

2    Court of Appeal.  (Lodgment 12.)  On August 28, 2013, the Court of Appeal denied habeas relief

3    in a reasoned opinion.  (Lodgment 13.)

4        Finally, Petitioner filed a petition for writ of habeas corpus in the California Supreme

5    Court.  (Lodgment 14.)  On December 18, 2013, the Supreme Court summarily denied the

6    petition.  (Lodgment 15.)

7                                          **III.**

8                    **SUMMARY OF THE EVIDENCE PRESENTED AT TRIAL**

9        Because Petitioner challenges the sufficiency of the evidence, this Court has

10   independently reviewed the state court record.[6]  Based on this review, this Court adopts the

11   factual discussion of the California Court of Appeal opinion in this case as a fair and accurate

12   summary of the evidence presented at trial:[7]

13              Late night on September 10, 2005, Michael Paez, who rented a room from

14       Jimmy Urbina in Hesperia, California, borrowed Urbina's vehicle and took

15       Sandoval and Odon Tellez shopping.  Alfonso Tellez, Odon's younger brother,

16       understood that Urbina had told Paez to put gas in the vehicle.  Before they left,

17       Odon recalled seeing Sandoval with a gun on his person.

18              As the group returned to Urbina's house, the vehicle ran out of gas, and

19       they pushed it to Urbina's garage.  The Tellez brothers saw that Urbina, who was

20       sitting on a chair in his garage, became upset because nobody put gas in the

21       vehicle.  Alfonso heard Sandoval tell Urbina something like, "Don't tell me that . .

22       . .  I wasn't driving."  Urbina started to get up and Sandoval, facing him, fatally

23       shot him four times, as Urbina tried to turn to his side.  The Tellez brothers

24       testified they got in their vehicle and were about to drive off when Sandoval and

25

26   _____

     [6] See Jones v. Wood, 114 F.3d 1002, 1008 (9th Cir. 1997).

27   [7] "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary .
     . . ." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (citing 28 U.S.C. §
     2254(e)(1)).  Thus, Ninth Circuit cases have presumed correct the factual summary set forth in an opinion of the

28   California Court of Appeal under 28 U.S.C. §2254(e)(1).  See, e.g., Moses v. Payne, 555 F.3d 742, 746 n.1 (9th Cir.
     2009) (citations omitted).

                                                   3

Paez jumped in the vehicle and asked to be taken to Adelanto, California.  The Tellez brothers refused and instead dropped them off at the house of Paez's aunt.

The San Bernardino County Chief Medical Examiner conducted an autopsy on Urbina's body, which had four entry wounds, one on the right shoulder and three in the back of the torso.  The gunshots damaged Urbina's heart, lungs, stomach, intestine, diaphragm, liver and spine, and he likely would have died within a few minutes.  The cause of death was multiple gunshot wounds to the chest and abdomen.

On September 18, 2005, border patrol agents stationed in Texas detained a vehicle carrying Sandoval and Paez.  Sandoval was carrying a loaded .45–caliber gun, which he said he needed to protect himself from gang members and gang activity.

In December 2005, Sandoval, using a pseudonym, confessed to the murder in a letter to his sister from jail: "I'm sending you this under some one else's name so I can get in trouble [*sic*] for what Im [*sic*] about to confess.  I did do what Im [*sic*] in here for.  There's two more but I never got caught.  Ive [*sic*] also fataly [*sic*] stabbed 2 guys.  They got lucky they made it.  Ive [*sic*] shot more people but never stayed around to see if they lived or not.  So all I do know is Im [*sic*] guilty of 3 murders."  Sandoval signed the letter, "Rambo 2 Guns".

In another December 2005 letter from jail, Sandoval admitted to his aunt that his arrest had stopped his criminal activities on the streets, but he noted, "I can still do things from in here.  And Im [*sic*] doing things in here as far as to make my name bigger than it already is."  He added, "These last court dates have gone all bad.  3 levas [*sic*] already showed up to point me out as the killer.  The gang unit showed up to point me out as a known gang member and active with the EME.  Ill [*sic*] explain on that later."

In a December 2005 phone call from jail, a recording of which was played for the jury, Sandoval told his girlfriend, "There's . . . three people already

4

pointing me out as the fucking killer," and added, "Shoulda killed them mother-fuckers, man.  Fuckin' bitch asses."  When told his mother was seeking to hire an attorney on his behalf, Sandoval replied, "It ain't gonna help.  Tell her there's three witnesses against me.  They got the fuckin'—the—the murder weapon.  Come on."  Sandoval recounted how the border patrol agents caught him with his .45–caliber gun on his person.

Both Sandoval and Paez admitted gang membership when they were booked into county jail.  Sandoval was photographed with gang tattoos on his body, and identified himself in a classification interview as a member of the East Side Santa Paula gang.  One of Sandoval's tattoos indicated his affiliation and allegiance to the Mexican Mafia.  Sandoval's moniker, "Rambo," was tattooed on his abdomen.  Paez, whose moniker is "Little Thumper," admitted being a member of the West Side Verdugo gang.

Santa Paula Police Officer Hector Ramirez testified as a gang expert that the Santa Paula 12th Street gang exists to commit crimes, including robberies, carjacking, sales of methamphetamine and heroin.  Officer Ramirez reviewed photographs of Sandoval's tattoos, including those that said, "S–P" on Sandoval's chest, Sandoval's gang classification card, as well as different witnesses' trial testimony, and opined Sandoval was a member of the Santa Paula gang.  Officer Ramirez testified gang members value respect as a measure of their status among fellow gang members, the general public, and rival gangs.  A gang member who has been disrespected, particularly in the presence of his fellow gang members, is expected to intimidate, harm or kill the person who disrespected him.  The disrespected gang member, and his gang, benefit from the impression he makes on witnesses to his retaliation for incidents of disrespect.  Officer Ramirez opined Sandoval had murdered Urbina in association with a criminal gang because during the incident, Sandoval was associating with Paez, another gang member.

San Bernardino Police Officer Nick Oldendorf testified as an expert that the purpose of West Side Verdugo, a "home-grown Hispanic street gang" affiliated with the Mexican Mafia, is "to conduct crimes such as murder, carjacking, robbery, extortion, grand theft auto, narcotic sales, firearm sales and acquisitions" so as to fund the gang. After reviewing photographs of Paez's tattoos and hand signs, Officer Oldendorf opined Paez's tattoos tended to "link" Paez to West Side Verdugo.

Officer Oldendorf testified West Side Verdugo members are expected to prevent others from disrespecting them. A gang member's speed and severity of reaction to being disrespected is heightened when other gang members are present. Officer Oldendorf opined the fact that on the one hand Paez had Sandoval's name tattooed on his body and, on the other hand, Sandoval had Paez's name tattooed on his body, significantly showed the two had "built some sort of bond." Officer Oldendorf testified he knew of an instance in which a West Side Verdugo member associated and actively committed gang activities with southern Hispanic gang members.

During Officer Oldendorf's direct examination, the prosecutor asked, "Now, you've had a chance to become familiar with the circumstances of this case that we're here on, correct?" Officer Oldendorf replied in the affirmative and confirmed he had heard some testimony. The prosecutor continued, "[F]rom what you know about this case and your understanding of criminal street gang culture, can you render an opinion whether or not the actions of the defendant that night could have been done for the benefit of, in association with, or at the direction of a criminal street gang?" Defense counsel objected on grounds the question would elicit testimony that was cumulative and irrelevant. The court overruled that objection, and Officer Oldendorf was permitted to elaborate: "In my opinion, a gang such as Santa Paula 12th Street, which is a smaller Hispanic street gang comparing to West Side Verdugo, which is a rather large criminal street gang, *it*

6

1     *appears as though the member of Santa Paula 12th Street was trying to impress a*

2     *member of West Side Verdugo and that way of impressing that subject and get*

3     *respect from that gang and that subject and being known as a soldier was to*

4     *commit the act.*"  (Emphasis added.)  Defense counsel objected that Officer

5     Oldendorf had provided an "[i]mproper opinion, not based on relevant facts that

6     we heard in court."  The court overruled the objection, and Officer Oldendorf

7     continued, "The basis of the crime was over disrespect and nothing more than

8     disrespect," and gang members regard many types of behavior, including looking

9     at someone wrong, as signs of disrespect.

10        *Defense Case*

11        Paez testified that he, Urbina and Sandoval had been drinking and using

12     methamphetamine the night of the incident.  Upon returning home, Urbina yelled

13     at Paez for not putting gas into the vehicle, and Paez denied he had agreed to do

14     so.  Urbina went inside the garage, returned and yelled at Sandoval.  Paez saw

15     Urbina was standing and was beginning to pull out his gun from his jacket just

16     before Sandoval shot him.  Paez did not contact police because at that time he was

17     already in trouble for violating the terms of his probation on a charge of reckless

18     discharge of a firearm.  In the summer before Urbina was killed, Paez got a tattoo

19     that included Sandoval's nickname, Rambo, because they were close friends.  The

20     same day, Sandoval got a tattoo that stated in Spanish that Paez was in Sandoval's

21     corner for life.

22        Sandoval testified that the night of the incident, he had his gun on his

23     person when he arrived at Urbina's house.  Everybody there was drinking beers,

24     and all except Alfonso were using methamphetamine.  Urbina was standing by his

25     garage and yelling obscenities at them when they returned to Urbina's house with

26     the vehicle.  Sandoval responded by walking off.  Sandoval recalled thinking,

27     "I'm not going to help push if this fool's going to be yell [*sic* ] and talk shit."

28     Sandoval was worried because previously he had seen Urbina handle a gun.

Based on Urbina's gestures and body language, Sandoval thought he might have been carrying a gun.  Sandoval saw Urbina pull out a gun, and thought Urbina was going to shoot him; therefore, Sandoval shot Urbina. Sandoval denied being a member of West Side Verdugo, the Mexican Mafia or any other gang, and disputed that his tattoos indicated same.  He admitted Paez belonged to West Side Verdugo.  At no time during the incident did Sandoval yell out a gang name or flash a gang sign.

(Lodgment 9 at 2-8 (footnote omitted).)

## IV.

## PETITIONER'S CLAIMS

Petitioner raises the following claims for habeas corpus relief:

(1) The trial court erred by allowing improper expert testimony;

(2) The prosecutor did not present sufficient evidence to support the gang charges;

(3) Petitioner's sentence violates the double jeopardy clause;

(4) The prosecutor did not present sufficient evidence to support Petitioner's murder conviction because he acted in self defense;

(5) The prosecution presented false evidence; and

(6) Petitioner's appellate counsel was ineffective for failing to raise the self-defense issue on appeal.

## V.

## STANDARD OF REVIEW

**A.    28 U.S.C. § 2254.**

The standard of review that applies to Petitioner's claims is stated in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"):

(d)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

1     (1) resulted in a decision that was contrary to, or involved an

2 unreasonable application of, clearly established Federal law, as determined by the

3 Supreme Court of the United States; or

4     (2) resulted in a decision that was based on an unreasonable

5 determination of the facts in light of the evidence presented in

6 the State court proceeding.

7 28 U.S.C. § 2254(d).  If these standards are difficult to meet, it is because they were meant to be.

8 As the United States Supreme Court stated in <u>Harrington v. Richter</u>,[8] while the AEDPA "stops

9 short of imposing a complete bar on federal court relitigation of claims already rejected in state

10 proceedings[,]" habeas relief may be granted only "where there is no possibility fairminded

11 jurists could disagree that the state court's decision conflicts" with United States Supreme Court

12 precedent.  Further, a state court factual determination must be presumed correct unless rebutted

13 by clear and convincing evidence.[9]

14 **B.** **Sources of "Clearly Established Federal Law."**

15   According to <u>Williams v. Taylor</u>,[10] the law that controls federal habeas review of state

16 court decisions under the AEDPA consists of  holdings (as opposed to dicta) of Supreme Court

17 decisions "as of the time of the relevant state-court decision."  To determine what, if any,

18 "clearly established" United States Supreme Court law exists, a federal habeas court also may

19 examine decisions other than those of the United States Supreme Court.[11]  Ninth Circuit cases

20 "may be persuasive."[12]  A state court's decision cannot be contrary to, or an unreasonable

21 application of, clearly established federal law, if no Supreme Court decision has provided a clear

22 holding relating to the legal issue the habeas petitioner raised in state court.[13]

23

24

---

[8] 562 U.S. 86, 131 S. Ct. 770, 786, 178 L. Ed. 2d 624 (2011).

[9] 28 U.S.C. § 2254(e)(1).

[10] 529 U.S. 362, 412, 120 S. Ct. 1495, 146, L. Ed. 2d 389 (2000).

[11] <u>LaJoie v. Thompson</u>, 217 F.3d 663, 669 n.6 (9th Cir. 2000).

[12] <u>Duhaime v. Ducharme</u>, 200 F.3d 597, 600 (9th Cir. 1999).

[13] <u>Brewer v. Hall</u>, 378 F.3d 952, 955 (9th Cir. 2004); <u>see also</u> <u>Carey v. Musladin</u>, 549 U.S. 70, 77, 127, S. Ct. 649, 649, 166 L. Ed. 2d 482 (2006) (in the absence of a Supreme Court holding regarding the prejudicial effect of spectators' courtroom conduct, the state court's decision could not have been contrary to or an unreasonable application of clearly established federal law).

1     Although a particular state court decision may be both "contrary to" and an

2  "unreasonable application of" controlling Supreme Court law, the two phrases have distinct

3  meanings under Williams.

4     A state court decision is "contrary to" clearly established federal law if the decision either

5  applies a rule that contradicts the governing Supreme Court law, or reaches a result that differs

6  from the result the Supreme Court reached on "materially indistinguishable" facts.[14]  If a state

7  court decision denying a claim is "contrary to" controlling Supreme Court precedent, the

8  reviewing federal habeas court is "unconstrained by § 2254(d)(1)."[15]  However, the state court

9  need not cite or even be aware of the controlling Supreme Court cases, "so long as neither the

10  reasoning nor the result of the state-court decision contradicts them."[16]

11     State court decisions that are not "contrary to" Supreme Court law may be set aside on

12  federal habeas review only "if they are not merely erroneous, but 'an unreasonable application'

13  of clearly established federal law, or based on 'an unreasonable determination of the facts.'"[17]

14  Accordingly, this Court may reject a state court decision that correctly identified the applicable

15  federal rule but unreasonably applied the rule to the facts of a particular case.[18]  However, to

16  obtain federal habeas relief for such an "unreasonable application," a petitioner must show that

17  the state court's application of Supreme Court law was "objectively unreasonable" under

18  Woodford v. Visciotti.[19]  An "unreasonable application" is different from merely an incorrect

19  one.[20]

20     Where, as here with respect to Claims One through Three, the California Supreme Court

21  denied a petitioner's claims without comment on direct review, the state high court's "silent"

22  denial is considered to be "on the merits" and to rest on the last reasoned decision on these

23

24

---

25  [14] Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) (per curiam) (citing Williams, 529 U.S. at 405-06).

26  [15] Williams, 529 U.S. at 406.
   [16] Early, 537 U.S. at 8.

27  [17] Id. at 11 (citing 28 U.S.C. § 2254(d)).
   [18] See Williams, 529 U.S. at 406-10, 413.

28  [19] 537 U.S. 19, 27, 123 S. Ct. 357, 154 L. Ed. 2d 279 (2002).
   [20] Williams, 529 U.S. at 409-10.

claims - in the case of Claims One through Three, the grounds the California Court of Appeal stated in its decision on direct appeal.[21]

Where, as here with respect to Claims Four through Six, the California Supreme Court denied the claims without comment on habeas review, this Court looks to the last reasoned decision on these claims - in the case of Claims Four through Six, the grounds the California Court of Appeal stated in its decision on habeas review.

## VI.

## DISCUSSION

**A.** **Petitioner Is Not Entitled to a Stay**

**1.** **Background**

On July 29, 2016, this Court issued its original Report and Recommendation addressing Petitioner's claims and recommending that the Petition be denied.  On August 22, 2016, Petitioner filed a Motion to Stay Ruling, requesting that this action be stayed while he exhausts a new claim in state court based on a recent opinion by the California Supreme Court.  Petitioner did not specify whether he is requesting a stay pursuant to Rhines v. Weber,[22] or Kelly v. Small.[23]  As discussed below, Petitioner is not entitled to a stay under either Rhines or Kelly.

**2.** **Rhines Stay**

Under Rhines v. Weber, this Court is empowered to stay the claims in a "mixed" petition while the petitioner returns to state court to exhaust his already pled, but unexhausted, claims.[24] To obtain a stay pursuant to Rhines, petitioner must show that:  (1) he has good cause for his failure to exhaust his claims in state court; (2) the unexhausted claims are potentially meritorious; and (3) there is no indication that he intentionally engaged in dilatory litigation tactics.[25]

Preliminarily, the Petition here is not a mixed petition -- it is a fully exhausted petition that the parties have completely briefed and the Court has considered, and for which a Report

---

[21] See Ylst v. Nunnemaker, 501 U.S. 797, 803-06, 111 S. Ct. 2590, 115 L. Ed. 2d 706 (1991).
[22] 544 U.S. 269, 125 S. Ct. 1528, 1535, 161 L. Ed. 2d 440 (2005).
[23] 315 F.3d 1063 (9th Cir. 2003).
[24] Rhines, 544 U.S. at 278.
[25] Id.

11

1  and Recommendation has already been issued.  In addition, the claim Petitioner proposes to

2  exhaust for future consideration by this Court is not meritorious for federal habeas corpus relief.

3  Petitioner's proposed claim relies on the recent opinion of the California Supreme Court in

4  People v. Sanchez[26] that a gang expert's opinion testimony based on information elicited at trial

5  and not on a hypothetical question violates the Confrontation Clause.  However, this state court

6  precedent is not sufficient to create a meritorious claim for federal habeas relief.  As there is no

7  United States Supreme Court precedent analogous to Sanchez, Petitioner's claim lacks merit on

8  federal habeas review.[27]  Accordingly, a Rhines stay is not warranted.

9       **3.**    **Kelly Stay**

10       A petition also may be stayed pursuant to the procedure the Ninth Circuit set forth in

11  Kelly v. Small.  To warrant a stay under Kelly: (1) the petitioner must file an amended petition

12  deleting the unexhausted claims; (2) the district court stays and holds in abeyance the fully

13  exhausted petition; and (3) the petitioner later amends the petition to include the newly exhausted

14  claims.[28]  A Kelly stay does not require a showing of good cause.[29]  However, a Kelly stay will

15  be denied when the court finds such a stay would be futile.[30]  Futility would exist if the

16  petitioner seeks a stay to exhaust a meritless claim.  Indeed, the purpose of the Kelly stay

17  procedure is to allow for a stay "when *valid* claims would otherwise by forfeited."[31]

18       Again, Petitioner has not presented a mixed petition.  Thus, the Kelly procedure, in which

19  an unexhausted claim must be deleted and exhausted, does not appear to contemplate a situation

20  such as this.  Also, as discussed above, petitioner's proposed claim is not supported by United

21  States Supreme Court precedent and, thus, does not present a meritorious claim for federal

22  habeas relief.  Accordingly, a stay here would be futile because petitioner's claim would not be

23  successful on future federal habeas review.  A Kelly stay is not warranted.

24  

25  [26] 63 Cal.4th 665 (2016).

   [27] Williams v. Taylor, 529 U.S. 362, 412, 120 S. Ct. 1495, 146, L. Ed. 2d 389 (2000) (the law that controls federal

26  habeas review of state court decisions under the AEDPA consists of  holdings (as opposed to dicta) of Supreme
Court decisions "as of the time of the relevant state-court decision.").

   [28] See King v. Ryan, 564 F.3d 1133, 1135 (9th Cir. 2009).

27  [29] Id. at 1140.

   [30] See Richson v. Biter, 2015 WL 5031916, *8 (C.D. Cal. Aug. 24, 2015).

28  [31] Kelly, 315 F.3d at 1070 (emphasis added); cf. Rhines, 544 U.S. at 277 (holding it is an abuse of discretion to
grant stay on plainly meritless claims).

1    For the foregoing reasons, it is recommended that Petitioner's request for stay be

2  denied.[32]  This Court notes that such a denial would not prevent Petitioner from seeking relief in

3  state court based on the recent state court precedent.

4  **B.    Expert Testimony**

5       **1.    Background**

6    In Claim One, Petitioner argues that the trial court erred by allowing the prosecutor's

7  gang expert to testify to Petitioner's state of mind.  (Petition at 5; MPA[33] at 23-26.)

8       **2.    State Court Opinion**

9    The California Court of Appeal detailed the challenged expert testimony and denied

10 Petitioner's claim, finding that even if the testimony was admitted in error, the error was

11 harmless:

12       During [San Bernardino Police] Officer [Nick] Oldendorf's direct

13       examination, the prosecutor asked, "Now, you've had a chance to become familiar

14       with the circumstances of this case that we're here on, correct?"  Officer

15       Oldendorf replied in the affirmative and confirmed he had heard some testimony.

16       The prosecutor continued, "[F]rom what you know about this case and your

17       understanding of criminal street gang culture, can you render an opinion whether

18       or not the actions of the defendant that night could have been done for the benefit

19       of, in association with, or at the direction of a criminal street gang?"  Defense

20       counsel objected on grounds the question would elicit testimony that was

21       cumulative and irrelevant.  The court overruled that objection, and Officer

22       Oldendorf was permitted to elaborate:  "In my opinion, a gang such as Santa

23       Paula 12th Street, which is a smaller Hispanic street gang comparing to West Side

24       Verdugo, which is a rather large criminal street gang, *it appears as though the*

25       *member of Santa Paula 12th Street was trying to impress a member of West Side*

26

27  [32] See Mitchell v. Valenzuela, 791 F.3d 1166, 1170-73 (9th Cir. 2015) (magistrate judge lacks authority to deny a stay request that disposes of a petitioner's claim).

28  [33] Along with the form Petition, Petitioner submitted a document titled "Supplemental Memorandum and Exhibits to Petition," which this Court refers to as a Memorandum of Points and Authorities or "MPA."

1    *Verdugo and that way of impressing that subject and get respect from that gang*

2    *and that subject and being known as a soldier was to commit the act.*"  (Emphasis

3    added.)  Defense counsel objected that Officer Oldendorf had provided an

4    "[i]mproper opinion, not based on relevant facts that we heard in court."  The

5    court overruled the objection, and Officer Oldendorf continued, "The basis of the

6    crime was over disrespect and nothing more than disrespect," and gang members

7    regard many types of behavior, including looking at someone wrong, as signs of

8    disrespect.

9            . . .

10           Assuming, without deciding, the trial court erred in admitting the

11   objected-to portion of Officer Oldendorf's expert testimony because it was not

12   phrased as a hypothetical but rather based on his opinion of Sandoval's conduct as

13   developed in trial testimony, any error was harmless.  We evaluate the admission

14   of expert testimony for harmless error under the standard announced in *People v.*

15   *Watson* (1956) 46 Cal.2d 818.  (*People v. Prieto* (2003) 30 Cal.4th 226, 247.)

16   However, any error would be harmless under the standard in *Chapman v.*

17   *California* (1967) 386 U.S. 18, 24 as well.

18           As noted, Sandoval did not object to Officer Ramirez's testimony, which

19   was materially indistinguishable from Officer Oldendorf's testimony.

20   Specifically, Officer Ramirez testified Sandoval was a gang member, and in

21   association with Paez, another gang member, murdered Urbina to benefit

22   Sandoval's respect and standing as a gang member, and the reputation of his gang.

23   To a substantial degree, Officer Oldendorf's testimony was merely cumulative to

24   that of Officer Ramirez's; therefore, we conclude beyond a reasonable doubt

25   Sandoval would not have obtained a different result in this case absent Officer

26   Oldendorf's testimony.

27   (Lodgment 9 at 6-7, 10-11.)

28   ///

14

### 3.   **Analysis**

As a general proposition, federal habeas courts "do not review questions of state evidence law."[34]  Accordingly, to the extent Petitioner's claim is based on alleged violations of state evidentiary laws, his claim is not cognizable on federal habeas review.

In addition, as the Ninth Circuit has explained, the Supreme Court has never held that "the Constitution is violated by the admission of expert testimony concerning an ultimate issue to be resolved by the trier of fact."[35]  A state court decision cannot be contrary to or an unreasonable application of Supreme Court precedent where the Supreme Court has not spoken on the issue.[36]

To the extent Petitioner's claim raises a viable due process issue, "[h]abeas is available for wrongly admitted evidence only when the questioned evidence renders the trial so fundamentally unfair as to violate federal due process."[37]  "Only if there are no permissible inferences the jury can draw from the evidence can its admission violate due process."[38]  Where the challenged evidence is relevant to an issue in the case, its admission cannot be said to have violated a defendant's due process rights.[39]  Officer Olendorf's testimony was undoubtedly relevant to the gang charges at issue at trial and, thus, did not violate due process.

Accordingly, the state courts' rejection of Petitioner's claim was not contrary to, or an unreasonable application of, clearly established federal law.  Habeas relief is not warranted on Claim One.

///

///

///

---

[34] See Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991); see also Windham v. Merkle, 163 F.3d 1092, 1103 (9th Cir. 1998) ("We have no authority to review alleged violations of a state's evidentiary rules in a federal habeas proceeding.").

[35] See id. at 758-59; Briceno v. Scribner, 555 F.3d 1069, 1077 (9th Cir. 2009) (rejecting claim that expert's testimony that hypothetical robberies were gang-related was unconstitutional because "there is no clearly established constitutional right to be free of an expert opinion on an ultimate issue").

[36] Carey v. Musladin, 549 U.S. 70, 77, 127 S. Ct. 649, 166 L. Ed. 2d 482 (2006).

[37] Jeffries v. Blodgett, 5 F.3d 1180, 1192 (9th Cir. 1993).

[38] Jammal, 926 F.2d at 920.

[39] See Estelle v. McGuire, 502 U.S. 62, 70, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991).

**C.    Sufficiency of the Evidence**

    **1.    Background**

In Claim Two, Petitioner argues that the evidence presented at trial was insufficient to support Petitioner's conviction for street terrorism under California Penal Code section 186.22(a) or the gang enhancement under section 186.22(b).  (Petition at 5; MPA at 27-29.)  In Claim Four, Petitioner argues the evidence was insufficient to support his conviction for first degree murder because he was acting in self-defense.  (Petition at 6; Petition, Exh. B.)[40]

    **2.    Legal Standard**

The Fourteenth Amendment's Due Process Clause guarantees that a criminal defendant may be convicted only "upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."[41]  The Supreme Court announced the federal standard for determining the sufficiency of the evidence to support a conviction in <u>Jackson v. Virginia</u>.[42]  Under <u>Jackson</u>, "[a] petitioner for a federal writ of habeas corpus faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds."[43]  The Supreme Court has held that "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[44]  "Put another way, the dispositive question under <u>Jackson</u> is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'"[45]

When the factual record supports conflicting inferences, the federal court must presume, even if it does not affirmatively appear on the record, that the trier of fact resolved any such

---

[40] Petitioner's claim is quite unclear.  In his habeas corpus petition to the California Court of Appeal, he claims "false evidence introduce[d] at trial negated a finding of imperfect/perfect self defense."  (Petition, Exh. B at 3.)  However, in that claim Petitioner does not make any attempt to show what "false evidence" was presented.  Rather, Petitioner details the evidence presented at trial and argues the evidence proved he acted in self-defense.  (Petition, Exh. B.)  Liberally construing Petitioner's claim, as it must, <u>Allen v. Calderon</u>, 408 F.3d 1150, 1153 (9th Cir. 2005) ("the district court must construe pro se filings liberally"), this Court interprets the claim to be that the evidence is insufficient to prove first degree murder.  To the extent Petitioner also raises a claim of false evidence, his claim is addressed below.

[41] <u>In re Winship</u>, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970).

[42] 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979).

[43] <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1274 (9th Cir. 2005).

[44] <u>Jackson</u>, 443 U.S. at 319; <u>see also</u> <u>Wright v. West</u>, 505 U.S. 277, 284, 112 S. Ct. 2482, 120 L. Ed. 2d 225 (1992).

[45] <u>Chein v. Shumsky</u>, 373 F.3d 978, 982-83 (9th Cir. 2004) (en banc) (quoting <u>Jackson</u>, 443 U.S. at 318).

1    conflicts in favor of the prosecution, and the court must defer to that resolution.[46]  "<u>Jackson</u>

2    cautions reviewing courts to consider the evidence 'in the light most favorable to the

3    prosecution.'"[47]  Additionally, "[c]ircumstantial evidence and inferences drawn from it may be

4    sufficient to sustain a conviction."[48]

5         The <u>Jackson</u> standard applies to federal habeas claims attacking the sufficiency of the

6    evidence to support a state conviction.[49]  The AEDPA, however, requires the federal court to

7    "apply the standards of <u>Jackson</u> with an additional layer of deference."[50]  The federal court must

8    ask "whether the decision of the California Court of Appeal reflected an 'unreasonable

9    application' of <u>Jackson</u> and <u>Winship</u> to the facts of this case."[51]

10        The federal court must refer to the substantive elements of the criminal offense as defined

11   by state law and look to state law to determine what evidence is necessary to convict on the

12   crime charged.[52]

13        **3.**    **<u>Gang Charges</u>**

14             **a.**    **<u>California Court Opinion</u>**

15        The California Court of Appeal on direct review rejected Petitioner's arguments that the

16   evidence was insufficient to support Petitioner's conviction for street terrorism or the jury's true

17   finding with respect to the gang enhancement:

18             Sandoval specifically argues, "[T]he shooting was based on a dispute

19        about the failure to put gas in the victim's car.  The victim was not a gang rival.

20        Evidence of a gang motivation is too speculative to be considered solid and

21        credible.  Evidence that [Sandoval] is a gang member and committed the crime in

22        the presence of another gang does not make this a gang crime."  Pointing out the

23        court in *Albillar, supra,* ruled mere gang membership does not violate the statute,

24        he claims, "[I]t follows that a someone [*sic*] who personally commits a crime

25   

---

26   [46] <u>Jackson</u>, 443 U.S. at 326.
     [47] <u>Bruce v. Terhune</u>, 376 F.3d 950, 957 (9th Cir. 2004) (quoting <u>Jackson</u>, 443 U.S. at 319).
     [48] Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995) (citation omitted).

27   [49] <u>Juan H.</u>, 408 F.3d at 1274; <u>Chein</u>, 373 F.3d at 983; <u>see also</u> <u>Bruce</u>, 376 F.3d at 957.
     [50] <u>Juan H.</u>, 408 F.3d at 1274.

28   [51] <u>Id.</u> at 1275 & n.13.
     [52] <u>Jackson</u>, 443 U.S. at 324 n.16; <u>Juan H.</u>, 408 F.3d at 1275.

while being a member of a gang has not violated [section 186.22, subdivision (a)
], unless the defendant willfully commits the crime to promote, further or assist
the gang."

"The gravamen of the substantive offense set forth in section 186.22 [,
subdivision] (a) is active participation in a criminal street gang.  We explained in
*People v. Castenada* [ (2000) ] 23 Cal.4th 743, that the phrase 'actively
participates' reflects the Legislature's recognition that criminal liability attaching
to membership in a criminal organization must be founded on concepts of
personal guilt required by due process: 'a person convicted for active membership
in a criminal organization must entertain "guilty knowledge and intent" of the
organization's criminal purposes.' [Citation.]  Accordingly, the Legislature
determined that the elements of the gang offense are (1) active participation in a
criminal street gang, in the sense of participation that is more than nominal or
passive; (2) knowledge that the gang's members engage in or have engaged in a
pattern of criminal gang activity; and (3) the willful promotion, furtherance, or
assistance in any felonious criminal conduct by members of that gang.  [Citation.]
All three elements can be satisfied without proof the felonious criminal conduct
promoted, furthered, or assisted was gang related."  (*Albillar, supra,* 51 Cal.4th at
pp. 55-56.)

In sum, section 186.22, subdivision (a) does not require proof the
defendant participated in a gang-related offense; rather, it only requires evidence
the defendant was an active member of a gang and participated in some manner in
an offense committed by a member of the gang.  (*Albillar, supra,* 51 Cal.4th at p.
55.)  In *Albillar,* three gang members participated in the rape of a 15-year-old girl.
In rejecting their contention their separate convictions under section 186.22,
subdivision (a) required proof the rape was gang-related, the court stated:
"[T]here is nothing absurd in targeting the scourge of gang members committing
*any* crimes together and not merely those that are gang related.  Gang members

1  tend to protect and avenge associates.  Crimes committed by gang members,

2  whether or not they are gang related or committed for the benefit of the gang, thus

3  pose dangers to the public and difficulties for law enforcement not generally

4  present when a crime is committed by someone with no gang affiliation.  'These

5  activities, both individually and collectively, present a clear and present danger to

6  public order and safety . . . .'"  (*Albillar, supra,* at p. 55.)

7       The testimony of gang expert Officer Ramirez established that both

8  Sandoval and Paez belonged to different gangs.  Both gangs placed a high

9  premium on respect, and their members were expected to intimidate or harm

10  others who disrespected them.  The bond between Sandoval and Paez was strong,

11  as evidenced by the fact they tattooed their bodies with each other's names.  The

12  jury could reasonably infer, consistent with Officer Ramirez's testimony, that

13  when Urbina shouted at the individuals for not putting gas in the vehicles,

14  Sandoval believed he was being disrespected and responded by shooting Urbina

15  so as to maintain his status for aggression, particularly because Paez, another gang

16  member, was present.  In light of *Albillar,* it was not required that the prosecutor

17  show either that Urbina's death be gang-related, or that it was committed with

18  another gang member.

19       Regarding the gang enhancement, we note, "[T]he scienter requirement in

20  section 186.22 [, subdivision] (b)(1)—i.e., 'the specific intent to promote, further,

21  or assist in any criminal conduct by gang members'—is unambiguous and applies

22  to *any* criminal conduct, without a further requirement that the conduct be 'apart

23  from' the criminal conduct underlying the offense of conviction sought to be

24  enhanced."  (*Albillar, supra,* 51 Cal.4th at p. 66.)  Further, section 186.22,

25  subdivision (b)(1) does not require the specific intent to promote, further, or assist

26  a *gang-related* crime.  "The enhancement already requires proof that the

27  defendant commit a gang-related crime in the first prong—i.e., that the defendant

28  be convicted of a felony committed for the benefit of, at the direction of, or in

association with a criminal street gang." (*Albillar, supra,* at p. 66.)  Expert

opinion that particular criminal conduct benefited a gang by enhancing its

reputation for viciousness can be sufficient to raise the inference that the conduct

was committed for the benefit of a criminal street gang within the meaning of

section 186.22, subdivision (b)(1).  (*Albillar, supra,* at p. 63.)

　　　　Sandoval contends, "[N]either the expert's speculation about [Sandoval's]

intent and the prosecutor's theory about [Sandoval] gaining respect amount to

solid or credible evidence.  There was no gang conversation or gang signs in

connection with the shooting.  Indeed, the shooting victim and the gang member

[Sandoval] was allegedly trying to impress were roommates [,] not rivals.  The

evidence is insufficient that the shooting was a gang crime."

　　　　As stated, Officer Ramirez testified Sandoval committed the crime for the

benefit of Sandoval's gang, which would gain stature from the fact one of its

members committed a vicious act to make sure the gang was respected.  Further,

based on the portions of Officer Oldendorf's testimony that Sandoval did not

object to, it was established that different gangs sometimes worked in association

with each other.  The jury could reasonably conclude on this record that Sandoval

committed the crime in association with a gang member as Sandoval and Paez,

both gang members, had a close personal relationship.  Additionally, following

the crime, both Sandoval and Paez got a ride with the Tellez brothers, and later

both were found by the border patrol near Texas.  Moreover, because under

*Albillar* it was not necessary that the offense be gang-related under section

186.22, subdivision (b)(1), it is immaterial that Paez was Urbina's roommate, or

that Sandoval did not speak about gangs or flash gang signs in connection with

the murder.  (*Albillar, supra,* 51 Cal.4th at p. 66.)

　　　　Finally, in finding the enhancement true, the jury could have relied on

Sandoval's confession in his letter from jail, in which he stated, "I did do what Im

[*sic* ] in here for."  By the time he wrote that letter in December 2005, the felony

complaint against him, filed in September 2005, had charged him with murdering

Urbina "with the specific intent to promote, further or assist in criminal conduct

by gang members" in violation of section 186.22, subdivision (b)(1)(C).

Therefore, the jury was entitled to rely on that confession in evaluating Sandoval's

credibility, and in weighing all the evidence to find the gang enhancement against

him true.

(Lodgment 9 at 12-16.)

### b. **Analysis**

#### i. **Street Terrorism**

Subdivision (a) of Penal Code section 186.22 makes it a crime to engage in criminal gang activity with other gang members. Specifically, "[a]ny person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang," is guilty of street terrorism.[53] After the California Court of Appeal issued its reasoned opinion affirming Petitioner's conviction on direct appeal, the California Supreme Court issued its decision in People v. Rodriguez.[54] In Rodriguez, the state supreme court held that the language "that gang" found in section 186.22(a) "refers back to the gang in which the defendant is an active participant,"[55] and that a gang member acting alone is insufficient to support a conviction for street terrorism under section 186.22(a).[56] More recently, in People v. Velasco,[57] the California Court of Appeal expanded on the Rodriguez holding to find that section 186.22(a) requires felonious conduct by two or more members of the *same* gang.[58]

Here, the prosecutor presented evidence that Petitioner committed the crime in the presence of Paez, who was also a gang member, and that the two attempted to flee the country

---

[53] Cal. Penal Code § 186.22(a).
[54] 55 Cal.4th 1125 (2012).
[55] Id. at 1131.
[56] Id. at 1139.
[57] 235 Cal.App.4th 66 (2015).
[58] Id. at 78.

21

together.  (1 RT at 132, 134, 150, 158, 191, 199-201; 2 RT at 235, 396, 399, 439.)  However, Petitioner and Paez were not members of the same gang.  Petitioner was a member of the Santa Paula 12th Street gang, a gang from Ventura County.  (3 RT at 488, 491-500, 518-26, 530.) Paez, on the other hand, was a member of the West Side Verdugo gang, a gang from San Bernardino County.  (3 RT at 500, 576, 580-82.)  There is no evidence that, at the time of the shooting, Petitioner participated in felonious criminal conduct with other members of his own gang.  Thus, the evidence is insufficient to support his conviction for street terrorism under California Penal Code section 186.22(a).  Accordingly, the state courts' denial of Petitioner's sufficiency of the evidence claim with respect to his street terrorism conviction is contrary to clearly established federal law under Jackson.[59]

Consequently, Petitioner cannot be retried on the street terrorism conviction.[60]  As noted above, the trial court imposed a three-year prison term for the street terrorism conviction, but the California Court of Appeal ordered that the sentence be stayed.  (Lodgment 9 at 21-23, 24.) Thus, petitioner's continued custody remains lawful under his first degree murder conviction and its related sentence – including the sentencing enhancement under Penal Code section 186.22(b). Accordingly, the appropriate remedy is to grant habeas corpus relief with respect to this portion of Claim Two, discharge petitioner from all consequences of his street terrorism conviction, vacate the portion of his sentence based thereon, and require the superior court to resentence petitioner accordingly.

### ii.    Gang Enhancement

Subdivision (b) of Penal Code section 186.22 requires a sentencing enhancement when the defendant is "convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . ."[61]  Put another way, California's gang enhancement "applies when a defendant has personally committed a gang-related felony with the specific

---

[59] See Valdez v. Frauenheim, 2015 WL 4065255, *7 (C.D. Cal. April 20, 2015).

[60] See Burks v. United States, 437 U.S. 1, 11, 18, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978) (holding that double jeopardy bars retrial when a conviction is reversed because the evidence presented at the first trial was legally insufficient); Greene v. Massey, 437 U.S. 19, 24, 98 S. Ct. 2151, 57 L. Ed. 2d 15 (1978) (same).

[61] Cal. Penal Code § 186.22(b)(1).

1    intent to aid members of that gang."[62]   Unlike section 186.22(a), section 186.22(b) may apply

2    even if a gang member acts alone.[63]   Finally, expert testimony may be sufficient to prove that

3    particular criminal conduct benefited a gang and was committed with the intent to aid gang

4    members.[64]

5         Here, the evidence established that Petitioner was a member of the Santa Paula 12th

6    Street gang.  (3 RT at 488, 491-500, 518-26, 530.)  In addition, Santa Paula Police Officer

7    Hector Ramirez, the prosecution's gang expert on Petitioner's gang, testified that respect is very

8    important to Hispanic gangs and that any perceived disrespect toward a member of the gang

9    would result in a violent response.  (3 RT at 532-33.)  If a member of the gang was disrespected,

10   that gang member would be expected to react by physically harming the person who disrespected

11   the gang member.  If the gang member did not so react, he would face physical harm at the hands

12   of his fellow gang members.  (3 RT at 533-34.)  Based on the facts of this case, Ramirez was of

13   the opinion that the shooting was committed for the benefit of Petitioner's gang and that the

14   crime would have enhanced the level of respect Paez had for Petitioner and Petitioner's gang.  (3

15   RT at 534, 537.)  In addition, Officer Oldendorf testified to his opinion that the shooting resulted

16   from the victim's show of disrespect toward Petitioner and that the shooting benefited

17   Petitioner's gang by impressing Paez and earning his respect.  (3 RT at 592-95.)

18        After viewing this evidence in the light most favorable to the prosecution and presuming

19   that the jury resolved all conflicting inferences from the evidence against Petitioner, this Court

20   finds that a rational juror "could reasonably have found beyond a reasonable doubt" that

21   Petitioner was liable for the gang enhancement under California Penal Code section 186.22(b).[65]

22   Mindful of the "sharply limited nature of constitutional sufficiency review" and applying the

23   "additional layer of deference" required by the AEDPA, this Court is unable to find that the

24

25   _____

     [62] People v. Albillar, 51 Cal.4th 47, 68 (2010).

26   [63] See People v. Rios, 222 Cal.App.4th 542, 546, 563-64 (2013).

     [64] See People v. Vang, 52 Cal.4th 1038, 1044-52 (2011) ("'Expert opinion that particular criminal conduct

27   benefited a gang' is not only permissible but can be sufficient to support the Penal Code section 186.22(b)(1) gang
     enhancement."); see also Esparza v. Uribe, 593 Fed. Appx. 728, 729 (9th Cir., Feb. 23, 2015) (jury could infer from
     gang expert's testimony that gang member who committed robbery alone acted with specific intent to aid gang

28   members).

     [65] Jackson, 443 U.S. at 325-26.

                                          23

1   California court's rejection of this claim was objectively unreasonable.[66]  Thus, habeas relief is

2   not warranted on the second portion of Claim Two.

3         **4.**     **First Degree Murder**

4           **a.**     **State Court Opinion**

5         The California Court of Appeal on habeas review rejected Petitioner's argument

6   regarding his first degree murder conviction, finding that Petitioner made "no effort to show that

7   the jury's finding is not supported by substantial evidence."  (Lodgment 13.)

8           **b.**     **Analysis**

9         Under California law, "[m]urder is the unlawful killing of a human being, or a fetus, with

10   malice aforethought."[67]  "[A]ny . . . willful, deliberate, and premeditated killing . . . is murder of

11   the first degree."[68]  Self-defense may act as a defense to murder.  "The doctrine of self-defense

12   embraces two types: perfect and imperfect."[69]  "'Perfect' self-defense requires that a defendant

13   have an honest and reasonable belief in the need to defend himself or another."[70]  "An instance

14   of imperfect self-defense occurs when a defendant acts in the actual but unreasonable belief that

15   he or she is in imminent danger of great bodily injury or death."[71]  "A killing in perfect self-

16   defense is neither murder nor manslaughter; it is justifiable homicide."[72]  On the other hand,

17   imperfect self-defense is a "'theor[y] of partial exculpation' that reduce[s] murder to

18   manslaughter by negating the element of malice."[73]

19         Petitioner insists the evidence supports his self-defense theory, either perfect or

20   imperfect, and thus does not support his conviction of first degree murder.  Petitioner argues that

21   he believed the victim was moving for a gun at the time of the confrontation and had to act to

22   protect himself.  (Petition at 6, Exh. B.)  However, Petitioner's argument merely encourages this

23

24   ─────────────────────

25   [66] <u>Juan H.</u>, 408 F.3d at 1274-75; <u>see also</u> <u>Jackson</u>, 443 U.S. at 319, 326.
    [67] Cal. Penal Code § 187(a).

26   [68] Cal. Penal Code § 189.
    [69] <u>People v. Rodarte</u>, 223 Cal.App.4th 1158, 1168 (2014).

27   [70] <u>People v. Iraheta</u>, 227 Cal.App.4th 611, 620 (2014).
    [71] <u>People v. Simon</u>, S102166, 2016 WL 3884094, at *22 (Cal. July 18, 2016).

28   [72] <u>People v. Randle</u>, 35 Cal.4th 987, 994 (2008), <u>overruled on other grounds by</u> <u>People v. Sarun Chun</u>, 45 Cal.4th
1172 (2009); Cal. Penal Code § 197.
[73] <u>People v. Moye</u>, 47 Cal.4th 537, 549 (2009).

1   Court to reweigh the evidence and interpret it in favor of Petitioner's self-defense theory. This

2   Court cannot engage in such reweighing of the evidence.[74]

3         Ultimately, the evidence presented at trial, when viewed in the light most favorable to the

4   judgment – as it must be – supports Petitioner's conviction for first degree murder. Before the

5   shooting, Odon Tellez rode to the store with Petitioner and Paez. During the trip, Tellez noticed

6   Petitioner carrying a gun in his waistband. (1 RT at 172.) Then, while Tellez and Petitioner

7   were sitting together in the car, Petitioner was watching a group of people and told Tellez "he . . .

8   kind of wanted somebody to go off" so that Petitioner could "smoke him." (2 RT at 433.)

9         When Petitioner, Paez, and Tellez returned to the victim's home, the victim was angry

10   that they had run his car out of gas. (1 RT at 150, 158, 191; 2 RT at 439.) Petitioner began to

11   argue with the victim, as the victim sat in a chair. (1 RT at 123, 192, 194; 2 RT at 237.) When

12   the victim moved to stand up, Petitioner pulled out his gun and shot him four times in the chest

13   and abdomen while the victim attempted to turn away for protection. (1 RT at 123, 125, 127,

14   195; 2 RT at 237, 304, 306, 327, 329-30.) The victim never made it out of his chair. (2 RT at

15   290.)

16         Petitioner did not seek help for the victim, as he might have if he believed the shooting

17   was justified. Instead, Petitioner jumped into the truck driven by the Tellez brothers and asked to

18   be driven away. (1 RT at 132, 134, 199-200.) Petitioner then attempted to flee the country while

19   still armed with the murder weapon. (2 RT at 349, 351, 359, 364, 392-96, 400, 426.) After his

20   arrest, Petitioner wrote letters stating he "did do what [he] was in [jail] for" and bragging about

21   his ties to the Mexican Mafia and about killing two other people. (3 CT at 547-48, 784-86.)

22         Finally, the gang experts testified that a gang member, such as Petitioner, would feel the

23   need to respond with violence to a perceived show of disrespect. (3 RT at 533, 587.)

24         This evidence could have led a reasonable trier of fact to conclude that Petitioner, an

25   armed gang member, was looking for any type of perceived provocation so that he could shoot

26   someone. When the victim became angry about the gas, Petitioner took the opportunity to

27

28   [74] Cavazos v. Smith, --- U.S. ----, 132 S. Ct. 2, 181 L. Ed. 2d 311 (2011) (reweighing of evidence precluded by Jackson).

1  calculatedly pull his gun and fire multiple shots into the core of the victim's body, all while the

2  victim sat in a chair in a position of vulnerability.  Petitioner then fled the scene and attempted to

3  flee the country, and, after being arrested, apparently admitted his guilt and bragged about his

4  other criminal activity.  After viewing this evidence in the light most favorable to the prosecution

5  and presuming that the jury resolved all conflicting inferences from the evidence against

6  Petitioner, this Court finds that a rational juror "could reasonably have found beyond a

7  reasonable doubt" that Petitioner is guilty of first degree murder.[75]  Thus, habeas relief is not

8  warranted on Claim Four.

9  **D.**      **Double Jeopardy**

10       **1.**      **Background**

11            In Claim Three, Petitioner argues his sentence of 25-years to life for the use of a firearm

12  pursuant to California Penal Code section 12022.53(d), in addition to his sentence for first degree

13  murder, violates double jeopardy principles because it punishes him for the same conduct.

14  (Petition at 6; MPA at 30-34.)

15       **2.**      **California Court Opinion**

16            The California Court of Appeal rejected this claim, reasoning:

17                 [Petitioner] acknowledges the California Supreme [C]ourt has ruled

18            against [his] position and declined to hold that enhancements are elements of the

19            offense for double jeopardy purposes (*People v. Izaguirre* (2007) 42 Cal.4th 126,

20            130–134), and we are bound to follow that decision (*Auto Equity Sales, Inc. v.*

21            *Superior Court* (1962) 57 Cal.2d 450, 455).  Nevertheless, he raises the issue to

22            preserve it for further review.  Relying on the California Supreme Court cases

23            cited above, we reject the contention.

24   (Lodgment 9 at 23.)

25       **3.**      **Analysis**

26            The Double Jeopardy Clause "protects against successive prosecutions for the same

27  offense after acquittal or conviction and against multiple criminal punishments for the same

28

---

[75] <u>Jackson</u>, 443 U.S. at 325-26.

offense."[76]  As relevant here, "[w]ith respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended."[77]  Sentence enhancements that increase the penalty for a crime based on the offender's conduct do not offend double jeopardy principles where "a legislature specifically authorizes cumulative punishment under two statutes . . . ."[78] The Ninth Circuit has concluded that sentencing a defendant to consecutive terms of imprisonment for first degree murder and a sentence enhancement pursuant to Penal Code section 12022.53(d) does not violate double jeopardy principles.[79]

In light of this authority, the state courts' rejection of Claim Three was not contrary to, or an unreasonable application of, clearly established federal law.  Thus, habeas relief is not warranted on Claim Three.

**E.    False Evidence**

**1.    Background**

Next, Petitioner claims the prosecutor presented false evidence.[80]  Petitioner argues "the false evidence presented at trial by the prosecution was the bias[ed] and false testimony by allegedly gang experts in Officers Ramirez and Olendorf."  (CM/ECF No. 10 at 12.)

///

///

---

[76] Monge v. California, 524 U.S. 721, 727-28, 118 S. Ct. 2246, 141 L. Ed. 2d 615 (1998).

[77] Missouri v. Hunter, 459 U.S. 359, 366, 103 S. Ct. 673, 74 L. Ed. 2d 535 (1983); see also Brown v. Ohio, 432 U.S. 161, 165, 97 S. Ct. 2221, 53 L. Ed. 2d 187 (1977) ("Where consecutive sentences are imposed at a single criminal trial, the role of the constitutional guarantee is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense.").

[78] Hunter, 459 U.S. at 368; see also Plascencia v. Alameida, 467 F.3d 1190, 1204 (9th Cir. 2006) ("When the legislature intends to impose multiple punishments, double jeopardy is not invoked.").

[79] Plascencia, 467 F.3d at 1204 ("[T]he language of California Penal Code § 12022.53 is clear.  Subsection (d) provides for a 25 year enhancement when a 'firearm is used' to commit murder.  There is, therefore, no question as to what the California legislature intended. . . . [T]he California legislature has simply determined that 'a criminal offender may receive additional punishment for any single crime committed with a firearm.'  Accordingly, we reject Plascencia's double jeopardy argument.").

[80] Petitioner did not clearly present this claim in the Petition.  However, the Petition incorporates by reference Petitioner's habeas corpus petition to the California Court of Appeal.  Within that state court petition, Petitioner raises a vague claim of false evidence without specifying what evidence he claims to be false.  (Petition, Exh. B at 23.)  In his Amended Reply, Petitioner directs this Court to his California Supreme Court habeas petition, which he lodged with this Court on November 6, 2013.  In that petition, Petitioner claims all of the testimony of the two gang experts was false.  (CM/ECF No. 10 at 6, 12.)  Even then, the focus of Petitioner's claim was on the admissibility and sufficiency of the gang evidence to prove Petitioner's guilt.  (CM/ECF No. 10 at 12-17.)

1

2. **Legal Standard**

2    In <u>Napue v. Illinois</u>,[81] the Supreme Court held that "a conviction obtained through use of

3    false evidence, known to be such by representatives of the State," violates a defendant's right to

4    due process under the 14th Amendment.[82]  To establish a due process violation under <u>Napue</u>, a

5    petitioner must prove that (1) the testimony was actually false, (2) the prosecution knew or

6    should have known that the testimony was false, and (3) the false testimony was material.[83]

7    Mere inconsistencies in testimony by government witnesses are insufficient to show actual

8    falsity under <u>Napue</u>.[84]  False evidence is material if there is "any reasonable likelihood that the

9    false testimony could have affected the judgment of the jury."[85]

10    3. **Analysis**

11    Petitioner does not specify the portions of the experts' testimony he believes are false.

12    Such conclusory allegations are insufficient to warrant habeas relief.[86]

13    To the extent Petitioner challenges the gang experts' testimony in its entirety, Petitioner

14    does not show any of the testimony was false.  Rather, Petitioner complains of the "bias[ed]

15    opinions" of the gang experts and argues those opinions were not supported by the evidence.

16    (CM/ECF No. 10 at 12.)  However, the fact that Petitioner does not agree with the experts'

17    opinions and believes the evidence should lead to a different opinion is not proof that the experts

18    testified falsely.  Moreover, Petitioner has not shown any reason to believe the prosecutor should

19    have known the experts offered false testimony.

20    Accordingly, the state courts' rejection of Petitioner's false evidence claim was not

21    contrary to, or an unreasonable application of, clearly established federal law.  Thus, habeas

22    relief is not warranted on Claim Five.

23    ///

24

---

25    [81] 360 U.S. 264, 269, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959).
     [82] <u>See also</u> <u>Jackson v. Brown</u>, 513 F.3d 1057, 1071 (9th Cir. 2008).

26    [83] <u>Id.</u> at 1071–72.
     [84] <u>See</u> <u>United States v. Bingham</u>, 653 F.3d 983, 995 (9th Cir. 2011).

27    [85] <u>United States v. Agurs</u>, 427 U.S. 97, 103, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976); <u>Libberton v. Ryan</u>, 583 F.3d
     1147, 1164 (9th Cir. 2009) (distinguishing standard from one asking whether there was reasonable probability of
     different outcome).

28    [86] <u>Jones v. Gomez</u>, 66 F.3d 199, 204 (9th Cir. 1995) ("It is well-settled that '[c]onclusory allegations which are not
     supported by a statement of specific facts do not warrant habeas relief.'").

**F.     Ineffective Assistance of Appellate Counsel**

     **1.     Background**

Finally, in Claim Six, Petitioner argues his appellate counsel was ineffective for failing to present on direct appeal an argument regarding self-defense such as the one Petitioner presents here.  (Petition at 6; MPA, Exh. B.)[87]

     **2.     State Court Opinion**

The California Court of Appeal rejected Petitioner's claim on habeas review, finding Petitioner could not establish prejudice for counsel's alleged error because Petitioner could not show he would have prevailed on appeal but for counsel's decision not to present the claim. (Lodgment 13.)

     **3.     Legal Standard**

In order to prevail on a claim of ineffective assistance of counsel under the United States Supreme Court decision in <u>Strickland v. Washington</u>, a petitioner must prove two elements:  (1) that counsel's performance was deficient, and (2) that the deficient performance prejudiced him.[88]  A court evaluating an ineffective assistance of counsel claim does not need to address both elements of the test if a petitioner cannot prove one of them.[89]

To prove deficient performance, a petitioner must show that counsel's performance was below an objective standard of reasonableness.[90]  There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[91]  Only if counsel's acts or omissions, examined in light of all the surrounding circumstances, fell outside this "wide range" of professionally competent assistance will petitioner prove deficient performance.[92]

---

[87] In his Amended Reply, Petitioner argues his appellate counsel was ineffective for failing to present Petitioner's false evidence claim on appeal.  (Amended Reply at 19-21.)  However, Petitioner did not present this claim in the original Petition or in the Court of Appeal habeas petition he incorporated into the original Petition.  It is not appropriate for a petitioner to raise new claims in his reply.  <u>Cacoperdo v. Demosthenes</u>, 37 F.3d 504, 507 (9 Cir. 1994) (a traverse is not a proper pleading to raise additional grounds for relief).  However, this Court has considered Petitioner's claim and finds it lacks merit.  This Court explained above that Petitioner's false evidence claim lacks merit.  Petitioner's appellate counsel was not ineffective for failing to raise this unmeritorious claim on appeal. <u>Miller v. Keeney</u>, 882 F.2d 1428, 1434 (9th Cir. 1989).

[88] <u>Strickland v. Washington</u>, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

[89] <u>Id.</u> at 697.

[90] <u>Id.</u> at 687-88.

[91] <u>Id.</u> at 689.

[92] <u>Id.</u> at 690.

1       Proof of deficient performance does not require habeas corpus relief if the error did not

2 result in prejudice.[93]  Accordingly, a petitioner must also show that, but for counsel's

3 unprofessional errors, the result of the proceedings would have been different.[94]  Thus, a

4 petitioner will prevail only if he can prove that counsel's errors resulted in a "proceeding [that]

5 was fundamentally unfair or unreliable."[95]

6       The <u>Strickland</u> standard also applies to claims of ineffective assistance of appellate

7 counsel based on the failure of counsel to raise particular claims on appeal.[96]  A habeas

8 petitioner must show that, but for appellate counsel's failure to raise the relevant claims, there is

9 a reasonable probability that the petitioner would have been successful on appeal. In the absence

10 of such a showing, neither <u>Strickland</u> prong is satisfied.[97]  Appellate counsel does not have a

11 constitutional duty to raise every non-frivolous issue a defendant requests.[98]  Counsel "must be

12 allowed to decide what issues are to be pressed."[99]  Otherwise, the ability of counsel to present

13 the client's case in accord with counsel's professional evaluation would be "seriously

14 undermined."[100]  There is, of course, no obligation to raise meritless arguments on a client's

15 behalf.[101]  The weeding out of weaker issues is widely recognized as one of the duties of

16 effective appellate lawyers, and counsel is not deficient for failing to raise a weak issue.[102]  In

17 order to prove prejudice in this context, Petitioner must show that he probably would have been

18 successful on appeal but for appellate counsel's errors.[103]  A court evaluating an ineffective

19 assistance of appellate counsel claim does not need to address both components of the test if the

20 petitioner cannot sufficiently prove one of them.[104]

21 *///*

22

---

23 [93] <u>Id.</u> at 691.

24 [94] <u>Id.</u> at 694.

25 [95] <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 369, 113 S. Ct. 838, 122 L. Ed. 2d 180 (1993).
[96] <u>Smith v. Robbins</u>, 528 U.S. 259, 285, 120 S. Ct. 746, 145 L. Ed. 2d 756 (2000).
[97] <u>See</u> <u>Pollard v. White</u>, 119 F.3d 1430, 1435-37 (9th Cir. 1997).

26 [98] <u>Jones v. Barnes</u>, 463 U.S. 745, 751, 103 S. Ct. 3308, 77 L. Ed. 2d 987 (1983).
[99] <u>Id.</u>
[100] <u>Id.</u>

27 [101] <u>See</u> <u>Strickland</u>, 466 U.S. at 687-88 (requiring a showing of deficient performance as well as prejudice).
[102] <u>Miller</u>, 882 F.2d at 1434.

28 [103] <u>Id.</u> at 1434 n.9.
[104] <u>See</u> <u>Strickland</u>, 466 U.S. at 697.

### 4.    **Analysis**

As discussed herein, this Court finds Petitioner's claim regarding the sufficiency of the evidence to support his murder conviction, even in light of Petitioner's self-defense theory, lacks merit.  Petitioner's appellate counsel was not ineffective for failing to raise this meritless claim on appeal.[105]

Accordingly, the state courts' rejection of Claim Six was not contrary to, or an unreasonable application of, clearly established federal law.  Thus, habeas relief is not warranted on Claim Six.

## VII.

## **RECOMMENDATION**

IT THEREFORE IS RECOMMENDED that the District Court issue an Order:  (1) approving and accepting this Final Report and Recommendation; (2) directing that Judgment be entered denying Petitioner's Motion to Stay Ruling and granting the Petition with respect to the insufficiency of the evidence claim directed at the street terrorism conviction and denying the Petition in all other respects; and (3) discharging Petitioner from all consequences of his conviction of street terrorism in violation of California Penal Code § 186.22(a) in San Bernardino County Superior Court Case No. FVI022536, vacating the portion of his sentence based thereon, and requiring the San Bernardino County Superior Court to resentence Petitioner accordingly within sixty (60) days.

DATED:  __October 3, 2016__       _____

HONORABLE LOUISE A. LA MOTHE
United States Magistrate Judge

---

[105] <u>Miller</u>, 882 F.2d at 1434.